**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2016-C6 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2016-C6, acting by and through Torchlight Loan Services, LLC, as Special Servicer under that certain Pooling and Servicing Agreement dated as of May 1, 2016<br><br>Plaintiff,<br><br>vs.<br><br>LAUREL CORPORATE CENTER, LLC, ENGIE RESOURCES LLC, BRIGHTVIEW LANDSCAPES LLC, F.M.A. CONTRACTING & MECHANICAL CONSTRUCTIONS, INC., and "JOHN DOE" NO. 1 THROUGH "JOHN DOE" NO. 100, the names of the "John Doe" Defendants being Fictitious and Unknown to Plaintiff, the Persons and Entities Intended Being Those Who May Be in Possession of, or May Have Possessory Liens or Other Interests in, the Premises Herein Described,<br><br>Defendants. | Case No. 25-CV-____________ |

**VERIFIED COMPLAINT**

Plaintiff Wells Fargo Bank, National Association, as Trustee ("**Trustee**"), on behalf of the Registered Holders of CSAIL 2016-C6 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2016-C6 (the "**Trust**") (Trustee, as trustee of the Trust, shall be referred to hereafter as "**Plaintiff**"), acting by and through Torchlight Loan Services, LLC ("**Torchlight**" or "**Special Servicer**"), as Special Servicer under that certain Pooling and Servicing Agreement dated as of May 1, 2016 (the "**PSA**"), by and through its attorneys, Alston & Bird LLP, alleges and states its complaint as follows:

1. Plaintiff, acting by and through Torchlight, acting solely in its capacity as Special

Servicer, brings this action seeking, among other things, the appointment of a rent and management receiver and to foreclose a mortgage on the certain real property and improvements located at and commonly known as 1000 Bishops Gate Boulevard and 2000, 4000, 9000, 10000, and 15000 Midlantic Drive, Mt. Laurel, New Jersey 08054, and more particularly described as Block 511 Lot 3, Block 503 Lot 2, Block 516 Lots 3, 4 and 6, and Block 501 Lot 6 on the tax map of the Township of Mount Laurel, County of Burlington, State of New Jersey and in **Exhibit 1** annexed hereto and made a part hereof (collectively, the "**Property**").

2. Plaintiff seeks this relief based on numerous uncured events of default by Borrower (as defined below) that jeopardize Plaintiff's rights and interests under the terms of the Loan (as defined below). Starting in November 2022, Borrower failed to comply with its obligations under the terms of the Loan to notify Plaintiff of the termination of a lease of a substantial tenant of the Property and to promptly place all lease termination payments received from that tenant in reserve with Plaintiff. Since then Borrower's defaults under the terms of the Loan have grown substantially in number and severity, including, *inter alia*: (i) failing to pay the principal, interest and other amounts due and owing under the Loan since February 6, 2024; (ii) failing to replenish the escrow account required to pay taxes on the Property; (iii) allowing mechanic's liens to be filed against the Property; (iv) entering into a lease for a major portion of the Property without obtaining or seeking Plaintiff's prior approval; (v) incurring additional indebtedness in violation of the Loan; (vi) refusing to comply with the required cash management provisions of the Loan and impermissibly distributing rents received from the Property to Borrower's investors; and (vii) failing to remit to Plaintiff the rents emanating from the Property and a proper accounting thereof. Several of these defaults were not disclosed by Borrower and only were recently discovered by Plaintiff. Collectively, Borrower's events of default present a substantial and imminent risk to the

Property and the Collateral (as defined below).

3. Accordingly, by this action, Plaintiff seeks, among other things, to foreclose the lien of the Mortgage (as defined below), to foreclose the lien of the UCC-1 on the Collateral, to take possession of the Property, and to have a receiver appointed to manage the Property and collect the rents and profits generated therefrom during the pendency of this action.

**PARTIES, JURISDICTION AND VENUE**

4. Trustee, acting solely in its capacity as trustee of the Trust, is a national banking association with its designated main office located in Sioux Falls, South Dakota.

5. Plaintiff is the current holder of the note, mortgage and balance of the loan documents that are the subject of this action, with an address c/o Torchlight Loan Services, LLC, 90 Park Avenue, New York, New York 10016. Torchlight, in its capacity as Special Servicer under the PSA, brings this action on Plaintiff's behalf.

6. Upon information and belief, Defendant Laurel Corporate Center, LLC (the "**Borrower**") is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware having a principal place of business at 587 Fifth Avenue, 10th Floor, New York, New York 10017.

7. Borrower is joined as a party defendant herein because it is the obligor on the subject note and the mortgagor of the subject mortgage and for the purpose of extinguishing any interest that it has or may have in and to the Property.

8. Upon information and belief, defendant Engie Resources LLC ("**Engie**") is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware having a principal place of business at 1360 Post Oak Blvd, Suite 400 Houston, Texas 77056.

9. Engie is joined as a party defendant herein solely because of any title or claim it might have or assert against the Property because of liens it holds against the Property, including, but not limited to, that certain judgment against Borrower in the amount of $2,040,648.47, entered March 20, 2024 in the Superior Court of New Jersey, County of Mercer, under Docket Number DJ-033184-24, and for the purpose of extinguishing any such right, title, claim or interest in all or any part of the Property.

10. Upon information and belief, defendant BrightView Landscapes LLC ("**BrightView**") is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware having a principal place of business at 980 Jolly Road, Suite 300, Blue Bell, Pennsylvania 19422.

11. BrightView is joined as a party defendant herein solely because of any title or claim it might have or assert against the Property because of liens it holds against the Property, including, but not limited to, that certain judgment against Borrower in the amount of $100,416.96, entered December 13, 2024 in the Superior Court of New Jersey, County of Burlington, under Docket Number L-001701-24 and Judgment Number J-147858-24, and for the purpose of extinguishing any such right, title, claim or interest in all or any part of the Property.

12. Upon information and belief, defendant F.M.A. Contracting & Mechanical Constructions, Inc. ("**F.M.A.**") is a corporation organized and existing under and by virtue of the laws of the State of New Jersey with a principal place of business at 2400 McClellan Avenue, Suite 101 East, Pennsauken, New Jersey 08109.

13. F.M.A. is joined as a party defendant herein solely because of any title or claim it might have or assert against the Property because of liens it holds against the Property and for the purpose of extinguishing any such right, title, claim or interest in all or any part of the Property

including, but not limited to, (i) that certain lien recorded on August 20, 2024, in the Office of the Burlington County Clerk (the "**County Clerk's Office**") in Book OR13731, Page 486, *et seq.*, in the amount of $116,038.46 and (ii) that certain lien recorded on August 20, 2024, in the County Clerk's Office in Book OR13731, Page 516, *et seq.*, in the amount of $171,568.49.

14. John Doe No. 1 through John Doe No. 100, inclusive, are fictitious and unknown to Plaintiff and are named herein to designate any and all tenants, occupants, persons, corporations or other entities, if any, having or claiming an interest in or lien upon the Property or any part thereof, which is subject to the lien of the Mortgage (as defined below).

15. Based on the foregoing, this Court has diversity jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a) because it is a dispute between citizens of different states and, as described in Paragraphs 17-19 and 87, *infra*, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16. Venue is proper in the Camden Division of the District of New Jersey pursuant to 28 U.S.C. § 1391(a) because the Property exists in Burlington County, New Jersey, which is in the Camden Division.

## STATEMENT OF FACTS

### A. The Loan and the Loan Documents

17. Pursuant to that certain Loan Agreement dated as of December 29, 2015 (the "**Loan Agreement**") executed by and between Borrower and The Bank of New York Mellon, a New York corporation (the "**Original Lender**"), Plaintiff's predecessor-in-interest, Original Lender made a loan to Borrower in the original principal amount of $48,500,000.00 (the "**Loan**"). A true and correct copy of the Loan Agreement is annexed hereto as **Exhibit 2** and made a part hereof.

18. To evidence its indebtedness under the Loan, Borrower, *inter alia*, executed and delivered to Original Lender that certain Promissory Note dated as of December 29, 2015 (the "**Note**"), in favor of Original Lender in the original principal amount of $48,500,000.00.

19. Pursuant to the Note, Borrower agreed, *inter alia*, to pay to the order of Original Lender the sum of $48,500,000.00 plus interest at the rates set forth in the Loan Agreement. The Note is payable on the sixth day of each month (the "**Monthly Payment Date**") from February 6, 2016, until January 6, 2026 (the "**Maturity Date**"), at which time all unpaid principal, accrued and unpaid interest and all other amounts due under the Loan Documents (defined below) (collectively, the "**Debt**"), were to be due and payable in full, unless earlier accelerated. A true and correct copy of the Note, with a subsequent allonge affixed to it, is annexed hereto as **Exhibit 3** and made a part hereof.

20. As collateral security for the payment of the Note, Borrower, *inter alia*, executed, acknowledged and delivered to Original Lender that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 29, 2015, encumbering the Property (the "**Mortgage**"). The Mortgage was recorded on February 9, 2016, in the County Clerk's Office in Book OR13209, Page 5174, *et seq.* The Mortgage is not a purchase money mortgage. A true and correct copy of the Mortgage is annexed hereto as **Exhibit 4** and made a part hereof.

21. The Mortgage includes an assignment of leases and rents in favor of the holder of the Mortgage whereby the Borrower, *inter alia*, absolutely assigned to the holder of the Mortgage all existing and future Leases and Rents (as defined therein).

22. The Mortgage also includes a security interest in favor of the holder of the Mortgage in, *inter alia*, all furniture, furnishings, fixtures, goods, equipment, inventory or

personal property located on, attached to or used at the Property, and all building materials and equipment situated at the Property, all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (the "**Collateral**"). The Collateral is more particularly described on **Exhibit 5** annexed hereto and made a part thereof.

23. As further collateral security for the payment of the Note, Borrower executed and delivered that certain Assignment of Leases and Rents dated as of December 29, 2015, in favor of Original Lender (the "**ALR**"). The ALR was recorded on February 9, 2016, in the County Clerk's Office in Book OR13209, Page 5210, *et seq.* A true and correct copy of the ALR is annexed hereto as **Exhibit 6** and made a part hereof.

24. In accordance with certain of Borrower's obligations under the Loan Agreement, Borrower and Original Lender, along with Borrower's property manager and Wells Fargo Bank, National Association, entered into that certain Cash Management Agreement dated as of December 29, 2015 (the "**Cash Management Agreement**"). A true and correct copy of the Cash Management Agreement is annexed hereto as **Exhibit 7** and made a part hereof.

25. In furtherance of Borrower's obligations under the Cash Management Agreement, Borrower, Original Lender and Wells Fargo Bank, National Association, also entered into that certain Deposit Account Control Agreement (Springing Lockbox) dated as of December 29, 2015 (the "**DACA**"). A true and correct copy of the DACA is annexed hereto as **Exhibit 8** and made a part hereof.

26. The Loan Agreement, the Note, the Mortgage, the ALR, the Cash Management Agreement, the DACA and all related loan documents shall be referred to collectively herein as the "**Loan Documents**."

**B. Assignment of the Loan Documents to Plaintiff**

27. Original Lender executed and delivered an Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of May 26, 2016 (the "**Assignment of Mortgage**") in favor of Plaintiff. By the Assignment of Mortgage, Original Lender transferred to Plaintiff all rights, title and interest in and to the Mortgage so that Plaintiff became the holder of the Mortgage entitled to all rights, title and interest in and to the Mortgage. The Assignment of Mortgage was recorded on November 17, 2016 in the County Clerk's Office in Book 16537, Page 672, *et seq.* A true and correct copy of the First Assignment of Mortgage is annexed hereto as **Exhibit 9** and made a part hereof.

28. Original Lender also executed and delivered an allonge to the Note (the "**Allonge**") dated as of May 2016, and bearing a special indorsement in favor of Plaintiff, pursuant to which Original Lender transferred to Plaintiff all of its rights, title and interest in and to the Note. By virtue of the Allonge, which is affixed to the Note, Plaintiff became the holder of the Note entitled to all rights, title and interest in and to the Note and the Loan. A true and correct copy of the Allonge is annexed hereto and made a part hereof as part of the copy of the Note annexed hereto as **Exhibit 3**.

29. Original Lender also executed and delivered an Assignment of Assignment of Leases and Rents dated as of May 26, 2016 (the "**Assignment of ALR**") in favor of Plaintiff. By the Assignment of ALR, Original Lender transferred to Plaintiff all rights, title and interest in and to the ALR so that Plaintiff became the holder of the ALR entitled to all rights, title and interest in and to the ALR. The Assignment of ALR was recorded on July 21, 2016 in the County Clerk's Office in Book OR13232, Page 4245, *et seq.* A true and correct copy of the Assignment of ALR is annexed hereto as **Exhibit 10** and made a part hereof.

30. Original Lender also executed and delivered a General Assignment dated as of May 2016 (the "**General Assignment**") in favor of Plaintiff. By the General Assignment, Original Lender transferred to Plaintiff all rights, title and interest in and to the Loan and the balance of the Loan Documents entitled to all rights, title and interest in and to the Loan and the Loan Documents. A true and correct copy of the General Assignment is annexed hereto as **Exhibit 11** and made a part hereof.

**C. Borrower's Defaults Under the Loan Documents**

31. Section 10.1 of the Loan Agreement defines the events that constitute an event of default under the Loan Documents (an "**Event of Default**"). Each of the Borrower's outstanding and uncured Events of Default that support the relief requested in this Verified Complaint are set forth in detail below.

***i. Payment Events of Default***

32. Section 2.6(a) of the Loan Agreement requires Borrower to make principal, interest, escrow and reserve payments (collectively, the "**Monthly Debt Service Payment Amount**") to Lender on each Monthly Payment Date, defined in the Loan Agreement as the 6th day of each calendar month.

33. Borrower failed to pay to Plaintiff the Monthly Debt Service Payment Amount that was due on February 6, 2024 (the "**February 2024 Payment Default**").

34. Section 10.1(a) of the Loan Agreement states that there shall be an Event of Default if Borrower shall fail to pay when due any monthly scheduled principal and/or interest payments under the Loan (the "**Debt Service**").

35. On March 6, 2024, and on each Monthly Payment Date thereafter through and including January 6, 2025, Borrower failed to pay the Monthly Debt Service Payment Amounts

due to Plaintiff. Borrower's failure to pay the Monthly Debt Service Payment Amounts in full for each Monthly Payment Date from February 6, 2024, through and including January 6, 2025, has resulted in the occurrence of several additional Events of Default under the Loan Documents, including, without limitation, under Section 10.1(a) of the Loan Agreement (collectively, the "**Payment Events of Default**").

36. On June 7, 2024, Borrower made a partial payment of $572,654.80 to Plaintiff which did not cure the Payment Events of Default that occurred and is continuing.

**ii.** ***Indebtedness Event of Default***

37. Section 5.1(a)(vii) of the Loan Agreement prohibits Borrower from incurring any additional debt except in certain limited circumstances.

38. Section 4.5(a) of the Loan Agreement states that Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property and shall promptly pay for all utility services provided to the Property.

39. Section 10.1(d) of the Loan Agreement states that an Event of Default shall occur if any of the covenants contained in Article 5 of the Loan Agreement are breached or violated and, if such breach is curable, Borrower does not cure such breach within ten (10) days of written notice from Lender.

40. In May 2024, Plaintiff discovered that (i) Engie filed a complaint against Borrower on August 2, 2023, in the District Court of Harris County, Texas, alleging that Borrower failed to pay for the electricity and equipment it received from Engie Resources in breach of their contract in the amount of $1,904,800.87 plus interest at the contract rate of 1.5% per month (the "**Engie Complaint**") and (ii) Engie obtained a default judgment against Borrower on December 20, 2023

in the amount of $2,040,648.47 plus post-judgment per diem interest of $939.35 (the "**Engie Judgment**"). Despite having an obligation to do so under the Loan Documents, Borrower did not notify Plaintiff of either the filing of the Engie Complaint or the entry of the Engie Judgment. True and correct copies of the Engie Complaint and the Engie Judgment are annexed hereto as **Exhibit 12** and made a part hereof.

41. Engie enforced the Engie Judgment against Borrower by garnishing Borrower's bank accounts, including the bank account into which the rents of the Property were being deposited. Upon information and belief, Engie was able to withdraw some of the rents generated from the Property, which were collateral for the Loan, through its garnishment of Borrower's bank account, prior to the Borrower redirecting the rents to an account that is unknown to Plaintiff and for which no accounting has been provided by Borrower.

42. As a result of the Engie Judgment and Engie Garnishment, Events of Default have occurred under the Loan Documents, including, without limitation, under Section 10.1(d) of the Loan Agreement (collectively, the "**Indebtedness Event of Default**").

**iii. *Tax Events of Default***

43. The Loan Agreement defines "Taxes" as "all taxes, assessments, water rates, sewer rents, business improvement district or other similar assessments and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof." *See* Ex. 2, Ex. A at 104.

44. The Loan Agreement defines Other Charges as "ground rents, maintenance charges, impositions other than Taxes, and any other charges, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied, assessed

or imposed against the Property or any part thereof." *See* Ex. 2, Ex. A at 99.

45. Section 4.5(a) of the Loan Agreement states that Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Section 4.5(a) further states that "Borrower's obligation to directly pay Taxes and Other Charges shall be suspended for so long as Borrower complies with the terms and provisions of Section 8.1 hereof. Section 8.1 obligates Borrower to deposit with Plaintiff as "Tax Reserve Funds" one-twelfth (1/12th) of the Taxes that Plaintiff reasonably estimates will be due over the following twelve months.

46. Section 10.1(b) of the Loan Agreement states that if any Taxes or Other Charges are not paid when the same is due and payable, it shall constitute an Event of Default under the Loan Agreement unless sums sufficient to pay such Taxes and Other Charges were deposited with Plaintiff in accordance with the Loan Agreement.

47. Borrower failed to deposit with Lender the Tax Reserve Funds necessary to pay the Taxes at the Property that were due on May 1, 2024, August 1, 2024, November 1, 2024, and February 1, 2025. As a result of such failures, Plaintiff made protective advances to pay Borrower's Taxes and to avoid the imposition of tax liens on the Property. Such protective advances were made by Lender on April 23, 2024, August 10, 2024, November 10, 2024 and January 22, 2025 in the aggregate amount of $1,122,410.74. Accordingly, additional Events of Default have occurred and are continuing under the Loan Documents because of Borrower's failure to pay the Taxes or previously deposit with Plaintiff the Tax Reserve Funds necessary to pay the Taxes for the Property that came due on May 1, 2024, August 1, 2024, November 1, 2024, and February 1, 2025 (collectively, the "**Tax Events of Default**").

**iv. *Lien Events of Default***

48. Section 4.5(a) of the Loan Agreement states that Borrower "shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the [Property]."

49. Section 4.16 of the Loan Agreement states that Borrower "will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the [Property] and never permit to exist in respect of the [Property] or any part thereof any lien or security interest … and in any event never permit to be created or exist in respect of the [Property] or any part thereof any other or additional lien or security interest other than the liens or security interests created by the Loan Agreement and by the Security Instrument" and certain other permitted encumbrances.

50. Section 6.1(a) of the Loan Agreement prohibits Borrower from causing or permitting a lien or encumbrance upon, or other transfer of a legal interest in, the Property without Plaintiff's prior written consent.

51. Section 10.1(i) of the Loan Agreement states an Event of Default shall exist if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days.

52. In December 2024, Plaintiff ordered a title search (the "**December 2024 Title Search**") and lien searches (the "**December 2024 Lien Search**") of the Property and Borrower and discovered additional instances of Borrower incurring additional liens and another judgment in violation of the Loan Documents, which liens and judgment were not disclosed by Borrower to Plaintiff.

53. First, the December 2024 Title Report disclosed that on August 20, 2024, F.M.A., one of Borrower's contractors, recorded two lien against the Property in the amount of $116,038.46 and $171,568.49, respectively (collectively, the "**F.M.A. Liens**"), in each case because of Borrower's failure to pay the amounts it owed to F.M.A. True and correct copies of the F.M.A. Liens are annexed hereto as **Exhibit 13** and made a part hereof.

54. Second, the December 2024 Lien Search disclosed that BrightView had obtained a default judgment against Borrower that was entered on December 13, 2024 in the amount of $100,416.96 (the "**BrightView Judgment**"). In reviewing the docket for the case that resulted in the entry of the BrightView Judgment, Plaintiff learned that BrightView had filed a complaint against Borrower on August 21, 2024 (the "**BrightView Complaint**") in which it alleged that Borrower failed to pay BrightView for landscaping services performed at the Property totaling $100,416.96. Borrower failed to appear in the action, which resulted in the entry of the BrightView Judgment. Despite its obligation to do so under the Loan Documents, Borrower did not disclose the filing of the Brightview Complaint or the entry of the Brightview Judgment to Plaintiff.

55. Third, the December 2024 Lien Search uncovered that Borrower was named as a defendant in a "quiet title" action regarding the Property that was filed on August 22, 2024, in the Superior Court of New Jersey, Burlington County (the "**Quiet Title Action**"). Despite being required to do so under the Loan Documents, Borrower did not disclose the Quiet Title Action to Plaintiff. Upon reviewing the docket for the Quiet Title Action, Plaintiff discovered that Borrower failed to file an answer in the Quiet Title Action and is currently in default in the litigation.

56. Fourth, the December 2024 Title Report disclosed that Borrower entered into an easement agreement with SBA Site Management, LLC that was recorded against the Property on July 31, 2024 (the "**SBA Easement**"). Despite being required to do so under the Loan Agreement,

Borrower did not disclose the SBA Easement to Plaintiff and did not obtain Plaintiff's consent to encumber the Property with the SBA Easement.

57. Accordingly, additional Events of Default have occurred under the Loan Documents, including, without limitation, under Section 10.1(i) of the Loan Agreement, as a result of the F.M.A. Contracting Liens, the BrightView Judgment, Borrower's failure to notify Plaintiff about or defend against the Quiet Title Action and the SBA Easement (collectively, the "**Lien Events of Default**").

**v. *Gallagher Lease Event of Default***

58. Under Section 4.14(f) of the Loan Agreement, Borrower is required to (a) notify Plaintiff in writing, within five (5) days following receipt thereof, of Borrower's receipt of any termination fee or payment (a "**Lease Event Payment**") paid by any tenant under any lease at the Property in consideration of any termination, modification or amendment or settlement of any Lease or any release or discharge of any tenant under any lease from any obligation thereunder (a "**Lease Event**"), and (b) place any such Lease Event Payment with Plaintiff in reserve within two (2) business days following receipt of the payment by Borrower. Section 10.1(a) of the Loan Agreement states an Event of Default shall occur if Borrower fails to pay when due any sums which by the express terms of the Loan Agreement require immediate or prompt payment without any grace period. Section 10.1(r) of the Loan Agreement states there shall be an Event of Default if Borrower continues to be in default under any term, covenant or condition of the Loan Agreement not otherwise specified in Section 10.1 of the Loan Agreement for thirty (30) days after notice from Lender.

59. On or about November 21, 2022, Borrower received written notice from a tenant at the Property, Gallagher Benefit Services, Inc. ("**Gallagher**"), notifying Borrower that Gallagher

was exercising its right to terminate its lease for 34,644 square feet at the Property effective August 31, 2023 (the "**Gallagher Lease Termination Notice**"). A true and correct copy of the Gallagher Lease Termination Notice is annexed hereto as **Exhibit 14** and made a part hereof.

60. Enclosed with the Gallagher Lease Termination Notice was a payment by Gallagher in the amount of $335,372.57, representing half of the $670,745.14 early termination payment due from Gallagher in accordance with its lease (the "**Gallagher Termination Payment**"). Gallagher stated in the Gallagher Lease Termination Notice that it would pay the remaining $335,372.57 of the Gallagher Termination Payment due to Borrower within 30 days after August 31, 2023.

61. Upon information and belief, Borrower received the second half ($335,372.57) of the Gallagher Termination Payment from Gallagher.

62. Despite its obligation to do so under the Loan Documents, Borrower failed to (i) notify Plaintiff of its receipt of the Gallagher Lease Termination Notice and (ii) remit the Gallagher Termination Payment to Plaintiff as required under the Loan Documents.

63. Accordingly, the failures of Borrower to notify Plaintiff of its receipt of the Gallagher Lease Termination Notice and to remit the Gallagher Termination Payment to Plaintiff constituted Events of Default under the Loan Documents, including, without limitation, under Sections 10.1(a) and 10.1(r) of the Loan Agreement (collectively, the "**Gallagher Lease Event of Default**").

**vi.** ***Major Lease Event of Default***

64. Section 4.14(b) of the Loan Agreement requires Borrower to obtain the consent of Plaintiff prior to entering into any "Major Lease." The definition of "Major Lease" in the Loan Agreement includes a lease that demises seven percent (7%) or more gross leasable area at the Property.

65. Additionally, Section 6.1(a) of the Loan Agreement prohibits Borrower from transferring any legal or beneficial interest in the Property except in certain limited circumstances.

66. Section 10.1(e) of the Loan Agreement states that an Event of Default shall occur if a transfer of an interest in the Property occurs that is not a permitted transfer under the Loan Agreement.

67. Section 10.1(r) of the Loan Agreement states there shall be an Event of Default if Borrower continues to be in default under any term, covenant or condition of the Loan Agreement not otherwise specified in Section 10.1 of the Loan Agreement for thirty (30) days after notice from Lender.

68. On or about August 24, 2023, Borrower executed a Lease with Lockheed Martin Corporation for 82,453 square feet at the Property (the "**Lockheed Lease**"). The Lockheed Lease represents 14.72% of the gross leasable area of the Property (560,210 square feet) and is therefore a "Major Lease" under the Loan Agreement. Despite the requirements and restrictions set forth in Sections 4.14(b) and 6.1(a) of the Loan Agreement, Borrower executed the Lockheed Lease without Plaintiff's prior consent.

69. Borrower's failure to obtain Plaintiff's prior consent to Borrower's execution of the Lockheed Lease constituted an additional Event of Default under the Loan Documents, including, without limitation, under Sections 10.1(e) and 10.1(r) of the Loan Agreement (the "**Major Lease Event of Default**").

**vii. *Cash Management Events of Default***

70. Section 1.a of the DACA and Sections 2(a) and 2(b) of the Cash Management Agreement each executed by Borrower in connection with the Loan respectively require Borrower to establish a "Deposit Account" and a "Cash Management Account" upon the occurrence of a

"Cash Trap Event Period" (each as defined in the Cash Management Agreement), which occurs upon the occurrence of an Event of Default under the Loan Documents.

71. Section 9.2 of the Loan Agreement requires all "Excess Cash Flow" (as defined in the Cash Management Agreement) to be deposited into the Excess Cash Flow subaccount held by Plaintiff during a Cash Trap Event Period.

72. Since the occurrence of the first Event of Default known to Plaintiff, Borrower has failed to comply with the provisions of the Loan Documents to set up the Deposit Account and Cash Management Account and deposit all rents of the Property into the Deposit Account. In addition to failing to comply with these obligations, Borrower has made several distributions of cash from the Property to its investors since Borrower stopped making its monthly Debt Service payments to Plaintiff in February 2024. Upon information and belief, Borrower has made at least eight investor distributions in the aggregate amount of $444,950.00 during the period of May 2024 through December 2024. These impermissible distributions were made by Borrower in violation of the Loan Documents while operating expenses at the Property, such as taxes and contractor invoices, continued to go unpaid and liens and judgments were being filed against Borrower and the Property.

73. Such breaches by Borrower, which remained uncured for more than thirty (30) days after Plaintiff demanded that Borrower cure them (*see* ¶¶ 77-79, *infra*) constitute additional Events of Default under Section 10.1(r) of the Loan Agreement (the "**Cash Management Events of Default**").

**viii. *Rent Events of Default***

74. Section 8.1(h) of the Mortgage and Section 3.1 of the ALR both provide that upon the occurrence and during the continuance of an Event of Default, Borrower's license to, *inter alia*,

collect the rents and apply it to the payment of the Debt shall be revoked and Plaintiff shall immediately be entitled to possession of all rents collected thereafter, including past due and unpaid rents.

75. Despite the occurrence of the numerous Events of Default detailed in the preceding paragraphs, Borrower has failed to comply with its obligations under the Mortgage and ALR by not, *inter alia*, delivering any rents to Plaintiff, directing Tenants to remit future rents to Plaintiff or providing Plaintiff with an accounting of all rents collected since the occurrence of the first Event of Default.

76. Such breaches by Borrower, which remained uncured for more than thirty (30) days after Plaintiff demanded that Borrower cure them (*see* ¶¶ 77-79, *infra*) constitute additional Events of Default under Section 10.1(r) of the Loan Agreement (collectively, the "**Rent Events of Default**").

## D. Plaintiff's Demand and Default Notices to Borrower

77. By letter dated December 15, 2023 (the "**December 2023 Demand Notice**"), Plaintiff, by and through its counsel, demanded Borrower to pay the Gallagher Termination Payment to Plaintiff in accordance with the Loan Documents. Borrower has refused and continues to refuse to turn over the Gallagher Termination Payment to Plaintiff. A true and correct copy of the December 2023 Demand Notice is annexed hereto as **Exhibit 15** and made a part hereof.

78. On April 17, 2024, Plaintiff, through its counsel, notified Borrower in writing (the "**First Notice of Default**") that Events of Default had occurred and were continuing because of the February 2024 Payment Default, the Gallagher Lease Events of Default and the Major Lease Event of Default. Plaintiff also notified Borrower in the First Notice of Default that due to the Events of Default that had occurred, Borrower's license to collect, use and enjoy the rents

generated by the Property was revoked in accordance with the terms of the Mortgage and ALR. A true and correct copy of the First Notice of Default is annexed hereto as **Exhibit 16** and made a part hereof.

79. By letter dated August 16, 2024 (the "**Second Notice of Default**"), Plaintiff, by and through its counsel, notified Borrower of the occurrence of the (i) Indebtedness Event of Default, (ii) the Cash Management Event of Default and (iii) the Rent Event of Default. A true and correct copy of the Second Notice of Default is annexed hereto as **Exhibit 17** and made a part hereof.

**E. Plaintiff's Remedies Under the Loan Documents**

80. The Loan Agreement states that upon the occurrence and during the continuance of an Event of Default and at any time thereafter Plaintiff may, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, take such action, without notice or demand, that Plaintiff deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Plaintiff may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity. *See* Ex. 2, § 10.2(a).

81. The Loan Agreement further states that upon the occurrence of an Event of Default, interest shall accrue at a rate totaling the sum of the Interest Rate (5.125%) plus the lesser of (a) the maximum non-usurious interest rate that may be charged under applicable law or (b) five percent (5%) above the Interest Rate (the "Default Rate"). Accordingly, the Default Rate is 10.125%. *See* Ex. 2, § 2.5(b) and Ex. A.

82. The Loan Documents provide that upon the occurrence and during the continuation of any Event of Default, Plaintiff may, in addition to Plaintiff's other rights and remedies under

the Loan Documents, at law and in equity, apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice to Borrower, which notice Borrower expressly waived, and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other person liable for the payment of the Debt, and Borrower expressly consented to the appointment of such receiver to take possession of and to operate the Property and to collect the Rents and to otherwise protect and preserve the Property. *See* Ex. 4, § 8.1(g); Ex. 5, §§ 2.1, 3.1.

83. The Loan Agreement further provides that Borrower shall be liable for all reasonable, out-of-pocket costs and expenses (including reasonable, actual out-of-pocket attorneys' fees and disbursements) reasonably incurred by Plaintiff in accordance with, among other things, (a) the enforcement of any remedies under the Loan Documents or Plaintiff's satisfaction of any of Borrower's obligations under the Loan Documents, (b) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property or any other security given for the Loan, and (c) otherwise protecting Plaintiff's interests under any Loan Document, including, without limitation, in connection with any "work-out" of the Loan or any insolvency, receivership or other similar proceeding in respect of Borrower. *See* Ex. 2, § 17.6.

### F. <u>Termination of Modification Discussions and Acceleration of the Debt</u>

84. In April 2024, Borrower requested to discuss a potential modification of the Loan and Plaintiff agreed to have such discussions on the condition that a pre-negotiation agreement be executed among Borrower and Plaintiff.

85. On May 16, 2024, Borrower, Plaintiff and Asher Roshanzamir, the guarantor of the

Loan ("**Guarantor**"), executed a Pre-Negotiation Agreement (the "**PNA**"). Pursuant to the PNA, Borrower agreed:

a. Plaintiff is the current holder of the Loan and Loan Documents;

b. Plaintiff had not and is not waiving any existing or future Events of Default under the Loan Documents;

c. during the continuation of discussions or negotiations, Plaintiff is not limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings, seeking the appointment of a receiver and/or other order directing the payment of the rents, issues and profits to a receiver or otherwise;

d. notwithstanding anything to the contrary contained in the PNA or otherwise, the conduct by and communications among the Parties and their respective Agents (whether in the future or prior to the date hereof) shall not constitute offers, acceptances, contracts, waivers, modifications or courses of dealing and shall have no effect whatsoever unless and until reduced to a written agreement signed by authorized representatives of the Parties to be bound (a "**Definitive Agreement**");

e. that neither Plaintiff nor Torchlight nor their respective shareholders, partners, members, servants, servicers, employees, officers, directors, affiliates, trustees, successors and assigns or their respective agents have any obligation whatsoever to engage in any discussions or negotiations or to agree to any courses of action with respect to the Loan, Borrower or the

Loan Documents and the indebtedness and obligations evidenced and secured thereby;

f. no duty was created by which Borrower, Guarantor, and Plaintiff shall be considered obligated to enter into a Definitive Agreement;

g. until a Definitive Agreement has been signed by the authorized representatives of Borrower, Guarantor, and Plaintiff, as appropriate, the Loan Documents remain unmodified and continue to be controlling; and

h. any of Borrower, Guarantor, or Plaintiff, in their sole and absolute discretion, may terminate the discussions and negotiations under the PNA regarding a potential modification of the Loan at any time and for any or no reason, without liability of any kind, by notice to the other parties to the PNA.

A true and correct copy of the PNA is annexed hereto as **Exhibit 18** and made a part hereof.

86. After several months of discussions and negotiations, Borrower, Guarantor, and Plaintiff agreed upon the business terms for a potential modification of the Loan and signed a term sheet on December 5, 2024, setting forth such terms (the "**Modification Term Sheet**"). A true and correct copy of the Modification Term Sheet is annexed hereto as **Exhibit 19** and made a part hereof.

87. In addition to setting forth the material business terms for a potential modification of the Loan Documents, the Modification Term Sheet also stated:

a. the modification would be subject to satisfactory legal review and documentation of the transaction, the transaction, including Torchlight's receipt of the approvals of its credit committee and Plaintiff's directing

certificateholder, and if necessary, a legal opinion from Plaintiff's REMIC counsel and any required rating agency approvals;

b. notwithstanding anything to the contrary set forth in the Term Sheet, the Term Sheet and the terms of the proposed loan modification were all subject to all the terms and conditions of the PNA;

c. nothing in the Term Sheet constituted a waiver of any right or remedy of Plaintiff under the Loan Documents or at law or in equity and all of such rights and remedies were expressly reserved in full;

d. the terms and conditions listed in the Term Sheet were not intended as, or to be treated as, a commitment by Plaintiff to enter into the proposed loan modification;

e. nothing contained in the Term Sheet would be deemed a modification of the Loan or the Loan Documents;

f. that the proposal set forth in the Term Sheet was only an outline of some of the terms of such proposal and terms and conditions of a modification of the Loan would be fully set forth in a modification agreement duly executed by Borrower, Guarantor, and Plaintiff; and

g. that until such time as a modification agreement was executed by authorized representatives of Borrower, Guarantor, and Plaintiff, the Loan Documents remained unmodified and in full force and effect.

88. As a result of, among other things, (a) Borrower's failure to deliver the information and documentation necessary for a potential modification of the Loan, (b) the continuing withholding of the rents from Plaintiff since February 2024, (c) the continuing distribution of rents

to Borrower's affiliates in violation of the Loan Documents, (d) the imposition of the F.M.A. Liens on the Property, (e) the incurrence of the BrightView Judgment, and (f) Plaintiff having to make a fourth protective advance on January 22, 2025 for the payment of the Taxes, on January 24, 2025, in accordance with Plaintiff's rights under the PNA, Plaintiff, through its counsel, issued a notice to Borrower (the "**Termination and Acceleration Notice**") stating that all discussions regarding a potential modification of the Loan and Loan Documents were immediately terminated, the entire Debt was accelerated and to be paid immediately to Plaintiff in full and that Plaintiff was proceeding with the exercising of its remedies under the Loan Documents, applicable law and in equity. A true and correct copy of the Termination and Acceleration Notice is annexed hereto as **Exhibit 20** and made a part hereof.

**FIRST COUNT**
**(Mortgage Foreclosure)**

89. Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 88 above, as if the same were set forth and repeated at length herein.

90. The Note, Mortgage, Loan Agreement and all other Loan Documents constitute valid and enforceable contracts between Plaintiff and Borrower.

91. Plaintiff at all relevant times, performed its obligations under the Loan Documents.

92. Borrower materially breached its obligations under the Loan Documents as a result of: (i) its failure to pay the principal, interest and other amounts due and owing under the Loan Documents that was due on February 6, 2024 and each Monthly Payment Date (as defined in the thereafter; (ii) its failure to pay the Taxes at the Property or to previously deposit with Plaintiff the Tax Reserve Funds necessary to pay the Taxes at the Property; (iii) allowing mechanic's liens in favor of F.M.A. to be filed against the Property; (iv) entering into the Lockheed Lease, a Major Lease, without obtaining or seeking Plaintiff's prior approval as required by the Loan Documents;

(v) failing to comply with its obligations under the Loan Documents to notify Plaintiff of the Gallagher Lease Termination Notice and the receipt of the Gallagher Termination Payment and to promptly place the Gallagher Termination Payment in reserve with Plaintiff; (vi) incurring additional indebtedness in favor of Engie and BrightView in violation of the Loan Documents; (vii) refusing to comply with the cash management provisions of the Loan Documents upon the occurrence of a Cash Trap Event and impermissibly distributing rents received from the Property to its investors during the continuance of other Events of Default; and (viii) failing to remit upon demand from Plaintiff the rents emanating from the Property and a proper accounting thereof during the occurrence of an Event of Default.

93. Despite Plaintiff's multiple demands that Borrower cure all of the aforementioned Events of Default, as of the date of this Verified Complaint, all of the Events of Default alleged herein remained uncured and are continuing.

94. Section 8.1(b) of the Mortgage provides that, upon the occurrence and during the continuance of any Event of Default, Plaintiff shall have the right to, among other remedies, "institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner." Ex. 4, § 8.1(b).

95. The Property is commercial in nature and was never occupied by Borrower as a personal residence. Accordingly, New Jersey's Fair Foreclosure Act, N.J.S.A. 2A:50-53, *et seq.*, does not govern the within action.

96. Plaintiff does not seek a Writ of Possession to evict any occupant protected by the New Jersey Anti-Eviction Act, N.J.S.A. 2A:18-61.1, *et seq*.

97. As of January 31, 2025, there is now due, owing and payable to Plaintiff under the Loan Documents $51,732,407.65, which is comprised of: (i) $43,879,296.48 in principal; (ii) accrued and unpaid interest at the Interest Rate in the amount of $2,286,294.18; (iii) accrued and unpaid interest at the Default Rate in the amount of $3,206,187.77, (iv) late fees in the amount of $290,518.44, (v) a prepayment premium in the amount of $1,316,378.89, (vi) protective tax advances in the amount of $1,122,410.74, (vii) a protective insurance advance in the amount of $21,843.15, (viii) other advances for Plaintiff's enforcement costs, including attorneys' fees, costs and expenses, in the amount of $126,697.50; and (vii) all other sums provided for under the Loan Documents.

98. In order to protect the lien and security represented by the Mortgage during the pendency of this foreclosure action, Plaintiff may be compelled to pay insurance premiums, taxes, assessments, water charges, sewer charges, attorneys' fees, repairs and other expenses or charges affecting the Property. Plaintiff asks that any amount so incurred during the pendency of this foreclosure action, along with any other applicable fees, costs and advances incurred, be added, pursuant to the Mortgage and the Loan Documents, to its claim and be repaid to Plaintiff from the proceeds of the sale of the Property, together with interest thereon from the date that such expenditures are made, and that the same be added to the amounts due Plaintiff and secured by the Mortgage and the Loan Documents.

99. Any interest or lien which any defendant herein has, or may claim to have, in or upon the Property, or any part thereof, is subject and subordinate to the lien of the Mortgage.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

a. Fixing the amount due to Plaintiff pursuant to the Loan Documents;

b. Directing that Plaintiff be paid the amounts due pursuant to the Loan Documents, with interest, advances, other charges, attorneys' fees and costs;

c. Adjudging that the Property be sold according to law to satisfy the amounts due to Plaintiff;

d. Barring and foreclosing the Defendants, and each of them, from all equity of redemption in and to the Property;

e. Upon separate application, appointing a receiver to take immediate possession of and manage the Property and to collect the rents, issues and profits of the Property;

f. Directing that the Defendants vacate and surrender the Property to a managing receiver and receiver of rents, issues and profits to be appointed by the Court; and

g. Awarding such other and further relief as the Court may deem just and proper.

**SECOND COUNT**
**(Possession)**

100. Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 99 above, as if the same were set forth and repeated at length herein.

101. By the terms of the Note, Mortgage and Loan Agreement and by reason of Borrower's Events of Default under the terms of the Loan Documents, Plaintiff is entitled to immediate possession of the Property and Collateral together with all improvements and appurtenances described in the Mortgage and in this Verified Complaint.

102. Defendants are now in possession of the Property and Collateral and have deprived or may deprive Plaintiff of possession of the Property and Collateral.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

a. Granting Plaintiff, its assignee, or the purchaser of the Property and Collateral at the foreclosure sale possession of the Property and Collateral;

b. Awarding Plaintiff damages for mesne profits;

c. Awarding Plaintiff its costs of suit, including reasonable attorneys' fees and costs; and

d. Awarding such other and further relief as the Court may deem just and proper.

**THIRD COUNT**
**(Security Interest Foreclosure)**

103. Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 102 above, as if the same were set forth and repeated at length herein.

104. To perfect its interest in the Collateral, on February 9, 2016, Original Lender recorded a Uniform Commercial Code Financing Statement (the "**UCC-1**") in the County Clerk's Office in Book OR13209, Page 5235 *et seq.* A true and correct copy of the UCC-1 is annexed hereto as **Exhibit 21** and made a part hereof.

105. By Uniform Commercial Code Financing Statement Amendment, Original Lender assigned the UCC-1 to Plaintiff (the "**UCC Assignment**"). On September 12, 2016, the UCC Assignment was recorded in the County Clerk's Office in Book OR13239, Page 3602 *et* seq. A true and correct copy of the UCC Assignment is annexed hereto as **Exhibit 22** and made a part hereof.

106. By Uniform Commercial Code Financing Statement Amendment, Plaintiff continued the effectiveness of the UCC-1 for an additional five years (the "**UCC Continuation**"). On October 1, 2020, the UCC Continuation was recorded in the County Clerk's Office in Book OR13474, Page 9863 *et seq*. A true and correct copy of the UCC Continuation is annexed hereto as **Exhibit 23** and made a part hereof.

107. When Borrower executed the Mortgage, it granted a valid and enforceable security interest in the Collateral.

108. Plaintiff holds a duly perfected security interest in the Collateral by virtue of the recorded Mortgage, the recorded Assignment of Mortgage, the recorded UCC-1, the recorded UCC Assignment, and the recorded UCC Continuation.

109. Pursuant to the terms of the Loan Documents, Plaintiff elects to have the

Collateral sold by the sheriff together with the Property at a single public sale.

110. No person or entity possesses an interest in the Collateral superior to the security interest held by Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows

A. Adjudging that the Collateral be sold together with the Property at a single public sale conducted by the sheriff to satisfy the amounts due to Plaintiff;

B. Barring and foreclosing the defendants of all equity of redemption in and to the Collateral;

C. Granting Plaintiff its costs of suit, including reasonable attorneys' fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**<u>FOURTH COUNT</u>**
**(Rent and Managing Receiver)**

111. Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 110 above, as if the same were set forth and repeated at length herein.

112. Borrower has breached the Loan Documents and allowed Events of Default to occur under the Loan Documents as a result of: (i) its failure to pay the principal, interest and other amounts due and owing under the Loan Documents that was due on February 6, 2024 and each Monthly Payment Date (as defined in the thereafter; (ii) its failure to pay the Taxes at the Property or to previously deposit with Plaintiff the Tax Reserve Funds necessary to pay the Taxes at the Property; (iii) allowing mechanic's liens in favor of F.M.A. to be filed against the Property; (iv) entering into the Lockheed Lease, a Major Lease, without obtaining or seeking Plaintiff's prior approval as required by the Loan Documents; (v) failing to comply with its obligations under the Loan Documents to notify Plaintiff of the Gallagher Lease Termination Notice and the receipt of the Gallagher Termination Payment and to promptly place the Gallagher Termination Payment in

reserve with Plaintiff; (vi) incurring additional indebtedness in favor of Engie and BrightView in violation of the Loan Documents; (vii) refusing to comply with the cash management provisions of the Loan Documents upon the occurrence of a Cash Trap Event and impermissibly distributing rents received from the Property to its investors during the continuance of other Events of Default; and (viii) failing to remit upon demand from Plaintiff the rents emanating from the Property and a proper accounting thereof during the occurrence of an Event of Default.

113. The Mortgage and ALR provide that Plaintiff shall be entitled to the appointment of a receiver without regard to the adequacy of security for the sums due or to become due under the Loan Documents.

114. The Mortgage further provides in Section 8.1(g) and the ALR further provides in Sections 2.1 and 3.1 that, upon the occurrence of an Event of Default, Borrower irrevocably consents to the appointment of a receiver.

115. Plaintiff is also entitled to collect the Rents by virtue of the assignment thereof contained within the Mortgage, the ALR and any other applicable Loan Documents.

116. The appointment of a rent receiver is necessary to protect and preserve the value of Plaintiff's security.

117. Further, because of the dangers of waste and diminution of the value of the Property occasioned and evidenced by, *inter alia*, the Lien Events of Default, the Tax Events of Default, the Rent Events of Default, and the Cash Management Events of Default, and because of the likelihood of Plaintiff's interests in the Property being irreparably harmed should the Borrower continue to manage the Property in the manner in which it has for the preceding eighteen months, the appointment of a receiver to manage the Property is necessary to protect and preserve the value of the Property.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows

A. Appointing a receiver of the rents and to manage the Property;

B. Directing all Tenants in possession of the Property to pay the receiver all rents;

C. Granting Plaintiff its costs of suit, including reasonable attorneys' fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: New York, New York
February 11, 2025

**ALSTON & BIRD LLP**
*Attorneys for Plaintiff Wells Fargo Bank, National Association, as Trustee on behalf of the Registered Holders of CSAIL 2016-C6 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2016-C6*

By: */s/ Richard J. Galati, Jr.*
Ryan M. Philp
Richard J. Galati, Jr.
90 Park Avenue
New York, New York 10016
(212) 210-9400
ryan.philp@alston.com
richard.galati@alston.com

**VERIFICATION**

I, Jorge Rodriguez, a Senior Vice President of Torchlight Investors LLC, the parent company of Torchlight Loan Services, LLC, Special Servicer for Plaintiff Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered Holders of CSAIL 2016-C6 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2016-C6 hereby verify that I have authorized the filing of this Verified Complaint, that I have reviewed the allegations made in the Verified Complaint, that I know the contents thereof, and that they are true to my knowledge, except as to matters alleged on information and belief, and as to those matters I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2025

JORGE RODRIGUEZ